# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **PAMELA MERCER**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 5565 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **COOK COUNTY, ILLINOIS**, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Pamela Mercer ("Plaintiff") brought this action against Defendants Cook County, Illinois, a unit of local government, Cook County Sheriff's Department, David Pitts ("Pitts"), Gus Paleologos ("Paleologos") (collectively "Defendants") and Local Council 3695 of the American Federation of State, County, and Municipal Employees ("the Union"). Pitts and Paleologos, both of whom are supervisors employed by the Cook County Sheriff's Department, are sued in their individual capacities. Alleging various acts of sex and race discrimination, retaliation, and harassment, Mercer asserts claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*., the First Amendment and the Equal Protection Clause, 42 U.S.C. § 1983, and the intentional infliction of emotional distress. Mercer also originally sought indemnification from Cook County for her alleged injuries pursuant to 745 ILCA 10/9-102, and

asserted a cause of action against the Union for failing to fairly represent her concerning her disputes with the Defendants.[1]

Before the Court is Defendants' motion for summary judgment concerning Mercer's claims of a hostile work environment based on sex and race, Title VII claims for race and gender discrimination, the Equal Protection Clause, the First Amendment, and the intentional infliction of emotional distress. The parties have consented to have this Court conduct any and all proceedings in this case, including entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons discussed below, the Court finds that Defendants' motion is granted.

## I.    Background

Mercer is an African-American woman who began working for the Sheriff's Office Department of Corrections ("DOC") as a correctional officer in April 1988.[2] (SOF ¶ 5.) She was eventually promoted to the rank of sergeant in 1993 and, in late 2005, was assigned to work at the Department of Community Service and Intervention ("DCSI"). (*Id.* ¶¶ 6-8.) The DCSI is a program designed to assist inmates in the DOC to reenter society through a variety of

---

[1] Claims against the Union were earlier dismissed with prejudice by District Judge Marvin Aspen. (*See* Dckt. 24.) Judge Aspen granted Mercer leave to file an amended complaint to reflect those dismissals, but she did not do so.

[2] Defendants' Local Rule 56.1 statement of facts ("SOF") is cited when Mercer has not disputed a fact. Local Rule 56.1(b)(3)(B) requires Mercer to file her own statement of facts that she believes justifies the denial of summary judgment, but she has not done so. The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with [Local] Rule 56.1." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005). Defendants urge the Court to refuse to consider any facts relied on by Mercer that she failed to assert in her missing additional statement of facts. Although courts can do so when the non-moving party fails to comply with the Local Rule, *id.*, the Court declines to impose such a sanction on Mercer in this case.

- 2 -

programs.  Up to 449 inmates are housed in five buildings that make up the DCSI.  (*Id.* ¶¶ 8-10.)

Three shifts of personnel cover the DCSI facility throughout a twenty-four hour period, and

Mercer was assigned to the 11:00 p.m. – 7:00 a.m. shift.  Between fifteen to twenty other officers

also worked this shift, including a Sergeant James and Sergeant Wright.  Mercer's duties

included supervising correctional officers, scheduling lunches, maintaining order, and

supervising searches and the movement of inmates.  (*Id.* ¶ 18.)  She was also required to counsel

non-performing correctional officers through informal conversations or, under certain

conditions, to pursue more severe discipline.  (*Id.* ¶ 20.)  In turn, Mercer was supervised by

plaintiffs Paleologos and Pitts, both of whom are lieutenants.  (*Id.* ¶¶ 14-17.)

In 2007, a series of informal and formal complaints were filed against, and by, Mercer.

On February 18, 2007, Mercer filed an inter-office memo with Internal Affairs Division ("IAD")

concerning what she perceived to be an attempt by her superiors to intimidate her and to create a

hostile work environment. These acts included being called to a meeting that Mercer believed to

be pointless, foul language used by Lt. Pitts, and an allegation that Lt. Paleologos touched her

without permission.  (Pl.'s Mem. at Ex. 14.)  This complaint was followed up with another

inter-office memo from Paleologos to his supervisor on March 28, noting that a number of other

officers had complained that Mercer supervised them too closely.  Paleologos defended Mercer

by stating that she was merely "doing her job" in supervising the officers.  (*Id.* at Ex. 2.)

Things took an uglier turn in August 2007 after Mercer returned from vacation on

August 14.  She discovered a sexually-graphic drawing in a washroom of Building 3, with her

name and the name of Officer J.W. Smith written over the top of the picture.  Mercer complained

about the drawing in a memo written to her shift commanders, Lts. Pitts and Paleologos, on

August 15, 2007. (*Id.* at Ex. 4.) She noted that a less graphic drawing had also been placed in a second bathroom and conjectured that the handwriting looked familiar based on her informal comparison of it to letters found in an office log book. (*Id.*) By all accounts, Mercer gave the book to Paleologos, who promptly washed the offending drawings off the walls. Mercer took offense at Paleologos' promptness and followed it up with an August 27, 2007 memo to her union complaining that Paleologos "immediately came over and washed the wall" without preserving the evidence. (*Id.* at Ex. 5.) For his part, Paleologos stated that he and Pitts were unable to correlate the handwriting with any particular log entry, and their investigation into the matter was unable to produce a witness to the incident. (SOF ¶ 55; Pl.'s Mem. at Ex. 12.) For seven days thereafter, Paleologos and Pitts announced at roll calls that such behavior would not be tolerated and that the perpetrators would be disciplined. (SOF ¶ 56.)

On September 5, 2007, Mercer filed a grievance with her union concerning alleged violations of the union's collective bargaining agreement. These included allegations of "ghost payrolling," staff insubordination without discipline, and complaints that Mercer had been physically pushed by a subordinate. She also complained that she was the victim of negative comments when she was not present for roll call and was subject to ongoing personal harassment. (Defs.' Mem. at Ex. 4.) The complaint was forwarded to the DOC's Inspector General. (*Id.* at Ex. 5.) Mercer also filed a similar complaint with the Sheriff's Office IAD. (Pl.'s Mem. at Ex. 7.)

In October 2007, a union representative told Mercer that she would be transferred out of DCSI to Division IV during the investigations associated with these complaints. IAD's Chief Investigator, Timothy Kaufmann, wrote Mercer on October 24, 2007 and stated that, as Mercer

- 4 -

had alleged that she was being harassed at her current work location, such a transfer was required. (Defs.' Mem. at Ex. 14.) Mercer remained on the DCSI payroll for the duration of her transfer. (SOF ¶ 23.) Mercer promptly utilized two weeks of accumulated time under the Family and Medical Leave Act, called in sick every work day for ten months, and filed a grievance concerning her temporary transfer to Division IV. (SOF ¶¶ 26-27.) Mercer was transferred back to DSCI in October 2008. (*Id*. ¶ 28.)

In October 2007, Mercer filed five charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, gender discrimination, and retaliation against her union and the Cook County Sheriff's Department. After receiving right to sue letters, she timely filed this action on September 8, 2009.

## II.  Legal Standard

Summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Such a fact issue exists only where a rational trier of fact could find for the nonmoving party. *Id*. at 324. The evidence, together with all reasonable inferences that can be drawn from it, must be viewed in the light most favorable to the nonmoving party. *Miller v. Am. Family Mut. Ins*., 203 F.3d 997, 1003 (7th Cir. 2000). The nonmoving party, however, cannot overcome a summary judgment motion by relying on unsubstantiated facts or by resting on its pleadings. *See Hemsworth, II v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Instead, the party that bears the burden of proof on an issue must demonstrate by

means of admissible evidence that a genuine issue of material fact exists that requires a trial.  *Id.*

A court neither weighs conflicting evidence nor resolves factual disputes in deciding whether

summary judgment is appropriate.  *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011,

1014 (7th Cir. 1996).

## III.   Discussion

As an initial matter, Mercer concedes that summary judgment is proper concerning her

First Amendment claim (Count IV) and her cause of action for the intentional infliction of

emotional distress (Count V).  Therefore, the Court grants Defendants' motion on Count IV and

Count V without further discussion.

### A.   Sex and Race Discrimination

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C.

§2000e-2(a)(1).   A plaintiff can prove a Title VII claim when she proffers direct evidence that

"is essentially an outright admission that a challenged action was undertaken for one of the

forbidden reasons covered in Title VII."  *Cordoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th

Cir. 2005) (internal quote and citation omitted).  When direct evidence of discrimination has not

been presented, a claim of disparate treatment under Title VII is examined under the

burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, a plaintiff has the burden of establishing a prima facie case of

discrimination by showing that he: (1) is a member of a protected class; (2) meets the employer's legitimate business expectations; (3) suffered an adverse employment action; and that (4) similarly-situated employees outside the protected class were treated more favorably. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The failure to demonstrate any one of these requirements is fatal to a Title VII claim. *Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008) ("Summary judgment is appropriate if the employee fails to establish any of the foregoing elements of the prima face case.").

If a plaintiff satisfies this standard, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010). Once shown, the burden reverts to the plaintiff to demonstrate that the employer's proffered reason is pretextual and that a discriminatory animus was the true reason for the employer's action. *Id.* Under Title VII, "the ultimate burden of demonstrating that the defendant intentionally discriminated always remains with the plaintiff." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

Mercer claims that summary judgment is not warranted in this case because she has direct evidence of discrimination based on race and sex. In support, she points to an incident in which subordinate officers complained about Mercer's supervision of them. As noted, Lt. Paleologos wrote a March 28, 2007 memo to Chief Tribilco about the complaints, stating that some of Mercer's officers "may not like taking corrective supervision from a female sergeant." (Pl.'s Mem. at Ex. 2.) Paleologos' memo, however, does not mention Mercer's race and is not evidence of discrimination against her on that ground. The memo is also not direct evidence that Mercer was discriminated against based on her sex. "The focus of any Title VII sex-

discrimination claim is whether the *employer* treated the employee differently because of the employee's sex." *Hall v. Nalco Co.*, 534 F.3d 644, 645 (7th Cir. 2008) (emphasis added). Here, Paleologos' memo is evidence that Mercer's co-workers were unhappy with her based on sex, but it does not suggest that her employer was. For his own part, Paleologos stated in the memo that "Sergeant Mercer is doing her job supervising and giving direction as needed." (Pl.'s Mem. at Ex. 2.) This provides no ground for concluding that Paleologus, who supervised Mercer, treated her differently based on sex. Accordingly, Mercer has not presented any direct evidence of disparate treatment and must move to the indirect method under *McDonnell Douglas*.

It is uncontested that Mercer meets two of the elements for doing so: as an African-American woman, she is a member of the protected classes for sex and race discrimination claims, and Defendants concede that she met their legitimate job expectations. Defendants contend, however, that Mercer was not subjected to an adverse employment action. Such an action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008) (internal quote and citation omitted). Such actions are ordinarily economic injuries. *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). Non-economic injuries can also qualify when they "materially alter the terms and conditions of employment." *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001).

Mercer claims that is the case here because her transfer from DCSI to Division IV while her complaints were being investigated changed her job responsibilities "in their entirety." (Pl.'s Mem. at 11.) Her argument, however, is based on that conclusory claim alone. Mercer has

produced no evidence that her job duties changed to such a degree that suffered an adverse

employment action. She does not even allege that her pay or benefits were affected, and has not

shown that the terms of her employment were materially altered by the transfer to Division IV.

An adverse employment action can be shown by demonstrating "a corresponding change in work

hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir.

2009). In this case, Mercer remained on the DCSI payroll for the duration of her assignment to

Division IV, and she does not argue that her career prospects changed while she was temporarily

detailed there. Mercer was clearly dissatisfied with the transfer to Division IV, but "[n]ot

everything that makes an employee unhappy qualifies as an adverse action for Title VII."

*Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).

Mercer also falls short of demonstrating the fourth element of a prima facie case of

discrimination – the similarly-situated employee. A plaintiff meets her burden of proof under the

*McDonnell Douglas* standard by showing that the proposed co-worker: (1) dealt with the same

supervisor, (2) was subject to the same standards, and (3) engaged in substantially similar

conduct such that the employer would not have grounds for treating the plaintiff and the

comparator differently. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). This inquiry

does not involve a "magic formula" or a "one-to-one mapping" between employees. *Humphries

v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Instead, courts examine the evidence in

"light of common experience" in order to determine if unlawful discrimination is at play in the

employer's personnel decision. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

Employees need not be identical in all ways in order to be similarly situated. *Caskey v.

Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008). However, they "must be directly

comparable to the plaintiff in all material respects." *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009) (internal quote and citation omitted).

Mercer fails to identify any non African-American employee who was treated more favorably than herself, essentially conceding this prima facie element of her Title VII race discrimination claim. She supports her sex discrimination allegation by first claiming that male employees were treated more favorably because no male officer was transferred to Division IV. This argument fails to demonstrate that Defendants applied the same standard to these (unspecified) male officers as they did to Mercer herself. Mercer was temporarily transferred to Division IV because she was the subject of an investigation, and because her own complaint of a hostile work environment was being investigated. (Pl.'s Mem. at Ex. 11.) She does not identify a proposed comparator who was either the subject of a complaint or who had filed a complaint that was being investigated. Instead, Mercer points to a generalized group of male officers who may, or may not, have been parties to grievances. As a result, no ground exists for concluding that Defendants applied the same standard to these male officers, or that they are "directly comparable" to Mercer. *Patterson*, 589 F.3d at 365.

Mercer also argues that, unlike her, other male officers were not required to turn in all of their keys and equipment at the end of a shift. In support, she cites the deposition testimony of her subordinate officer, Nicholas Zaccaro. Mercer's reliance on Zaccaro's testimony is misplaced on several fronts. As Zaccaro stated, he did not work in the same department as Mercer in 2007, when the majority of the incidents at issue in this case took place. (Pl.'s Mem., Zaccaro Depo. at 5.) Even if his testimony were relevant, moreover, it fails to show how Defendants treated male employees differently on this issue. Zaccaro testified that both male *and* female officers were

not always required to turn in their equipment in the same manner as Mercer. (Zaccaro Depo. at

9.) This may be evidence that her superiors singled out Mercer for stricter rules, but it is not

evidence that they did so *because* she was a woman. That is the only salient issue at this stage of

the *McDonnell Douglas* analysis because the purpose of the comparator analysis "is to eliminate

other possible explanatory variables, such as differing roles, performance histories, or

decision-making personnel, which helps isolate the critical independent variable – discriminatory

animus." *Coleman*, 667 F.3d at 846 (internal quote and citation omitted).

Mercer also claims that male officers were not required to supervise both Buildings 3 and

4 while they were on duty. Once again, her reliance on Zaccaro's testimony fails to support such

a claim. Zaccaro stated that Mercer supervised both Buildings 3 and 4 when only she and a

lieutenant supervisor were available. By contrast, "other sergeants" were not required to do so

under the same circumstances. (Zaccaro Depo. at 9-10.) Zaccaro did not testify, however, that

the other sergeants in question were male, and he made clear that both male and female sergeants

regularly worked at the facility in addition to Mercer. (*See id*. at 9.) Zaccaro also failed to state

that Mercer and the proposed male comparators shared the same supervisor who made the

decisions about what buildings the sergeants were required to look after.[3] *See*

*Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (stating that a

"decisionmaker" in this context means the person responsible for the employment decisions at

---

[3] Zaccaro stated that when no lieutenant was available, the senior ranking sergeant
became the shift commander. Mercer claims that she was treated less favorably than a
lower-ranking male sergeant who was made shift commander instead of her. As before,
however, her exclusive reliance on Zaccaro's testimony is fatal to her claim. Zaccaro stated that
the shift command could be given to either male *or* female sergeants instead of to Mercer.
(Zaccaro Depo. at 11.) He also gave no testimony on who made these specific decisions.

issue). Mercer does not allege that is the case, and no evidence shows that a common supervisor assigned her and the comparators to their respective job duties.

As a result, Mercer has not demonstrated a prima facie case of discrimination because she fails to show that a similarly-situated employee exists or that she suffered an adverse employment action. But assuming for the sake of argument that a prima facie case has been shown, the Defendants have shifted the burden back to Mercer by proffering a legitimate, non-discriminatory reason for their actions. The employer's burden at the second stage of the *McDonnell Douglas* analysis is not onerous. *See Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999) (describing the employer's burden at this stage as light). According to Defendants, Mercer was transferred to Division IV because she had filed a complaint concerning a hostile work environment; a complaint against her was also being investigated, and she was transferred for the duration of the investigation.

To carry her burden, Mercer must show that Defendants' alleged reason is merely a pretext for discrimination. *Everroad*, 604 F.3d at 477. This involves more than showing that the employer was mistaken or that its proffered reason is trivial or without merit. *McCoy v. WGN Contl. Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the [relevant action]." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). *See also Hudson*, 375 F.3d at 561 ("Pretext is more than a mistake on the part of the employer; it is a phony excuse.").

Mercer has not provided any reason for concluding that Defendants' proffered reason for her transfer to Division IV is a pretext for race or sex discrimination. Her only claim along these

- 12 -

lines is that Defendants have *not* offered an explanation. (Pl.'s Mem. at 13.) Clearly, however, they have done so by relying on Chief Investigator Kaufmann's October 24, 2007 memo to Mercer concerning her transfer to Division IV. Mercer contends that this "smacks of illegitimacy" because her transfer was based on "an alleged infraction of the rules." (*Id*.) This claim, which is unsupported by any reference to the record, fails to show why the reasoning Kaufman stated in his memo to Mercer was not, in fact, the true motivation for transferring her to Division IV.

As part of their proffered reason, Defendants claim that the decision to limit Mercer's access to certain equipment was non-discriminatory because it was directed to all sergeants, not just to Mercer herself. (Defs.' Mem. at 9.) Mercer admits that in September 2007, Lt. Pitts told her that only shift commanders could sign out master keys and that sergeants could only sign out radios in the building to which they were assigned. (Pl.'s Resp. SOF ¶ 48.) Pointing to her own deposition testimony, Mercer claims that this is a pretext for sex discrimination because Defendants applied the new rule in a disparate manner. According to Mercer, the same rules did not apply to a sergeant James. Rather than supporting a claim of pretext, Mercer's testimony undermines her argument because Mercer made clear that sergeant James was also a woman. (Mercer Depo. at 62, 177.) Once again, Defendants may have applied the rule more strictly to Mercer than to other employees, but Mercer's testimony that other female officers were treated differently from her does not permit an inference that Defendants viewed Mercer differently because of her sex.[4] *See Jackson v. E.J. Brach Corp*., 176 F.3d 971, 983 (7th Cir. 1999) ("For

_____

[4] Mercer also suggests that Defendants' proffered reason is pretextual because their actions allegedly followed her formal complaints concerning alleged violations of her rights as

(continued...)

- 13 -

[plaintiffs] to make a successful demonstration that [defendant's] reason was a pretext for discrimination, they must also provide evidence of at least an inference that the real reason for their dismissal was discriminatory.").

For these reasons, Defendants' motion is granted on Mercer's claim for sex discrimination (Count II) and race discrimination (Count VI) under Title VII.

### B.     **Hostile Work Environment**

Mercer also claims that she was unlawfully subjected to a hostile work environment based on her sex (Count II) and her race (Count VI).  Title VII prohibits employers from allowing a work environment that is hostile to employees because of the employees' inclusion in a protected class such as race or gender.  *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002).  To establish a cause of action under Title VII for a hostile work environment, a plaintiff must show that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her protected class status; (3) it was severe or pervasive enough to alter the conditions of her environment and to create a hostile or abusive work environment; and, (4) there is a basis for employer liability.

---

[4](...continued)
an employee.  (Pl.'s Mem. at 13.)  That claim essentially argues that Defendants took action against her in retaliation for her complaints of a hostile work environment and other prohibited employment conditions.  But any argument based on retaliation is misplaced under these facts.  Title VII forbids, in part, retaliation against a person who "has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a).  The Title VII claims in Mercer's Complaint include only race and sex discrimination, though she did assert retaliation claims in some of her EEOC charges.  Thus, even if evidence exists that Defendants' proffered reason is a pretext for prohibited retaliation, the same evidence does not necessarily show that the Defendants' true motive was race or sex discrimination.

*Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). Harassment includes "all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996).

Not all workplace harassment satisfies this standard. Instead, the harassment "must be sufficiently severe or pervasive" to be actionable. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). A plaintiff need not show both severity and pervasiveness, as "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts." *Haugerud v. Amery School Dist.*, 259 F.3d 678, 693 (7th Cir. 2001). But the plaintiff must demonstrate that her work environment was both subjectively and objectively hostile. *Id.* An objectively hostile environment is one that a reasonable person would find to be abusive. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). Courts should look to the totality of the circumstances involved, including: (1) the frequency of the abusive conduct; (2) its severity; (3) whether it is threatening, humiliating, or merely offensive; and, (4) whether it reasonably interferes with the plaintiff's work performance. *Haugerud*, 259 F.3d at 693.

Both Plaintiff and Defendants recite a list of incidents that form the basis of Mercer's harassment claims. These include the pornographic pictures and additional graffiti Mercer found drawn in a restroom when she returned from vacation in August 2007; inappropriate touching by Lt. Paleologos and sergeant Ford; and false allegations made against her by the officers she supervised. In addition, Mercer overheard another officer used the word "nigger" in September 2007; was present when a different officer referred to female officers at the training

academy as "those bitches;" and, an additional officer said "oh, bitch" during a conversation with Mercer.

Mercer concedes that she has no evidence to support her racial harassment claim and that summary judgment is appropriate on that issue. Her sex-based claim stands on a firmer evidentiary ground, but not all of the comments Mercer cites give rise to an inference that her workplace was objectively or subjectively hostile. The phrase "those bitches," for instance, was directed to third persons who attended the training academy for officers, not to Mercer herself. Merely uttering an offensive word is not sufficient to demonstrate a hostile work environment, especially when the comment is directed to someone other than the plaintiff. *See McPhaul v. Bd. of Comm. of Madison County*, 226 F.3d 558, 567 (7th Cir. 2000); *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004).

Mercer's reliance on a female officer saying "oh, bitch" fares little better. The Seventh Circuit has emphasized that the potential hostility of remarks must be seen in the context in which they are made. *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007). Mercer admits that the officer used the word "bitch" during an informal discussion between women officers. Mercer clearly experienced the comment as offensive, but she testified that it was made in the context of what she perceived to be a misplaced attempt at humor; Mercer corrected the officer by saying "we don't joke like that. We don't play like that." (Mercer Depo. at 161.) As Mercer stated, the women in the conversational group "cross[ed] the line" in the flow of their discussion (*id.*), and her perception of the remark as playful, albeit offensive, does not make the officer's comment actionable under Title VII. *See Yuknis*, 481 F.3d at 554-555 ("The point is elementary: the creation of a hostile working environment is actionable under

- 16 -

Title VII only when the hostility is to a group . . . such as women, whom the statute protects."); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (internal quote and citation omitted).

The sexually-graphic drawing of Mercer presents a more serious issue. Unfortunately, neither side has presented any argument on how this incident supports its case. Instead of analyzing all the elements of a harassment claim for the parties, the Court notes that Mercer has not explained why her employer can be held liable for this incident. To do so, she must demonstrate "that the employer knew of the problem . . . and that the employer did not act reasonably to equalize working conditions once it had knowledge." *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373 (7th Cir. 2007). *See also Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011) ("An employer may be liable for a hostile work environment created by employees when the employer does not promptly and adequately respond to employee harassment."). It is undisputed that Paleologos promptly investigated the incident, announced for seven days in a row that such behavior would not be tolerated, and stated that the perpetrator would be disciplined. (SOF ¶ 56.) In fact, Mercer complained to her union that Paleologos acted *too* quickly when he "immediately came over and washed the wall." Given that Mercer has not even contended that this action was so dilatory or negligent that her employer should be held liable for the drawings, no genuine issue of material fact exists on this issue.

Mercer also fails to explain why the allegedly inappropriate touching she experienced was so pervasive that it constituted a hostile work environment. She claims in her brief that she was physically touched by Officer Ford and Lt. Paleologos, and she directs the Court's attention

to Exhibit 9 in support. Exhibit 9 is an interoffice memo to IAD Chief Kaufman on various alleged retaliations against Mercer, but it does not make any reference to inappropriate touching by Ford or Paleologos. However, Mercer testified in her deposition that Ford "bumped" her when he took off a sweatsuit that he was wearing over his official uniform. (Mercer Depo. at 106.) She also stated that Paleologos "walked past me and bumped my not so small backside." (*Id*.)

Mercer does not attempt to explain why these minimal contacts constitute a hostile work environment based on her sex. Acts of erotic or hostile touching can be more severe than words alone. *See Hostetler v. Quality Dining, Inc*., 218 F.3d 798, 807 (7th Cir. 2000). But it is not self-evident that the incidents in this case even involved intentional acts of touching, instead of accidental contacts while these persons were engaged in other activities. Even if they were intentional, the evidence is not sufficient to conclude that a material issue exists concerning their sexually harassing nature. This is not a case in which an intimate body part was touched, or where the touch was more than momentary. *See Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001) (explaining that such acts increase the severity of the contact). In light of the infrequency of these contacts, together with the absence of any sexual comment, the "bumping" Mercer cites falls in line with actions that the Seventh Circuit has consistently found to be insufficient to demonstrate a sexually hostile work environment. *See*, *e.g.*, *McPherson v. City of Waukegan*, 379 F.3d 430, 434 (7th Cir. 2004) (finding it insufficient that a supervisor pulled back the plaintiff's shirt to see her bra); *Adusumilli*, 164 F.3d at 361-62 (stating that "four isolated incidents in which a co-worker briefly touched [plaintiff's] arm, fingers, or buttocks" not enough to establish a Title VII claim).

- 18 -

For these reasons, Defendants' motion is granted on Mercer's claim of a hostile work environment based on sex (Count II) and race (Count VI).

### C.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment precludes a state or local government employer from engaging in the sexual harassment of an employee. *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990); *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986). Victims of such discrimination can seek redress under Section 1983 of the Civil Rights Act. *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006). When, as here, an equal protection claim is also asserted against an individual employee of a stage agency, a plaintiff must show that the individual acted under color of state law by demonstrating that the infringing actions are in someway related to the performance of the individual's job duties. *See Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001) ("Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law") (internal quote and citation omitted). An equal protection action against a supervisor can succeed only where the official was directly responsible for the improper conduct and "knowingly, willfully, or at least recklessly caused the alleged deprivation by [his] action or failure to act." *McPhaul*, 226 F.3d at 566 (quoting *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986)).

The standard governing an Equal Protection claim generally follows that of a Title VII claim, except that a § 1983 plaintiff must also show an intent to harass her. *King v. Bd. of Regents of the Univ. of Wis. Sys.*, 898 F.2d 533, 537 (7th Cir. 1990). A single act of

discrimination can be sufficient to show a violation of the Equal Protection Clause, and a "plaintiff therefore need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class is by itself enough." *Bohen*, 799 F.2d at 1187. However, the harassment must be so pervasive as to have altered the conditions of employment and to create an abusive environment. *Id*. at 1186. A plaintiff must also show that the discriminatory acts were intentionally based on the plaintiff's gender and not because of other "factors personal" to the plaintiff. *Id*. at 1187; *see also Zoch v. City of Chicago*, No. 94 C 4788, 1997 WL 89231, at *39 (N.D. Ill. Feb. 4, 1997).

Relying almost entirely on her Title VII arguments, Mercer claims that her allegations of sexual harassment are so severe that they meet this standard. Without more, however, those arguments fail for the same reasons they do not create an issue of material fact on the Title VII claims. Notably, Mercer does not argue that the Defendants had the intent to harass her, stating instead that Pitts and Paleologos "condoned" the deprivation of her constitutional rights. In support, she cites a flurry of exhibits without explaining how they support her claim. These exhibits provide no ground for concluding that either Pitts or Paleologos was personally responsible for depriving her of a constitutional right, either by direct participation or by failing to act in disregard of that right. *Rascon*, 803 F.2d at 274. No evidence, for example, supports a conclusion that Pitts or Paleologos was responsible for the sexual drawing of Mercer or allowed it to occur. Instead, Paleologos took prompt action to investigate and remedy the situation when it was brought to his attention.

Mercer points to complaints co-workers made about her supervision of them, apparently contending that Paleologos failed to address the situation appropriately. But it is difficult to

understand how such complaints are themselves evidence of harassment so severe that it amounts to the deprivation of a constitutional right. Mercer has made no showing of what the underlying complaints involved or why they were so offensive that they altered the conditions of her work environment. Moreover, Paleologos wrote Chief Tribilco that Mercer had done her job supervising the officers and that he would "address the complaints for their validity." (Pl.'s Mem. at Ex. 2.) Instead of being a violation of her rights, such a statement would appear to be a supervisor's reasonable response to grumblings about Mercer's management style. As a result, Mercer has not demonstrated how Pitts or Paleologus "knowingly, willfully, or at least recklessly" deprived her of a right, *McPhaul*, 226 F.3d at 566, and Defendants' motion is granted on this issue (Count III).[5]

## IV. Conclusion

Based on the foregoing analysis, the Court finds that no genuine issues of material fact exist as to Mercer's Title VII or § 1983 claims, and Defendants' Motion for Summary Judgment is granted.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** March 27, 2012.

---

[5] Mercer also seeks indemnity from Cook County pursuant to 745 ILCS 10/9-102, 55 ILCS 5/4-603, and 55 ILCS 5/5-1106. Under these provisions, the county is liable to pay any judgment for compensatory damages for which an officer of the county is liable. No liability exists, and Mercer's indemnity claim (Count I) is denied as moot.